## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

KIMBERLY M.,

            Plaintiff,

      v.

KILOLO KIJAKAZI,
Acting Commissioner of the Social
Security Administration,

            Defendant.

Case No. 18-cv-4206

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

On October 3, 2013, Plaintiff Kimberly M. applied to the Social Security Administration (SSA) for Disability Insurance Benefits (DIB), alleging that she became disabled as of September 23, 2013 due to: chronic back pain; pelvic floor myalgia; arthritic knees; numbness in her right arm and fingers; depression; attention deficit disorder; and lack of concentration. [5-1] at 195–97, 217–18. An Administrative Law Judge (ALJ) determined that Plaintiff was not disabled and denied her claim for benefits. *See id.* at 574–82. After the SSA denied review, Plaintiff filed suit in this Court, claiming that the ALJ erred in several respects, and the case was assigned to Magistrate Judge Weisman, who agreed, sending the case back to the SSA for further proceedings. *See id.* at 608–12.

On remand, the ALJ again determined, on March 21, 2018, that Plaintiff is not disabled and again denied her claim for benefits. *Id.* at 553–64. Plaintiff now seeks judicial review of the second ALJ decision, *see* [1], and asks the Court to reverse the SSA's decision and award benefits. *See* [7]. In response, the Commissioner seeks an

order affirming the decision that Plaintiff is not disabled and not entitled to benefits. *See* [20]. For the reasons explained below, this Court denies Plaintiff's motion [7], grants Defendant's motion [20], and affirms the Commissioner's decision.

## I.   <u>Factual Background & Procedural History</u>[1]

Plaintiff was born on July 24, 1961. [5-1] at 84. At the age of fifty-two, she filed an application for DIB, alleging that she became disabled as of September 23, 2013 due to: chronic back pain; pelvic floor myalgia; arthritic knees; numbness in her right arm and fingers; depression; attention deficit disorder; and lack of concentration. *Id.* The SSA denied her application initially on December 17, 2013, and on reconsideration on June 11, 2014. *Id.* at 608. Plaintiff requested a hearing before an ALJ, and the case was assigned to Victoria A. Ferrer, who held the requested hearing on October 2, 2015. *Id.* at 37–88, 574. ALJ Ferrer issued a decision on January 22, 2016, finding that Plaintiff was not disabled and denying her claim for benefits. *Id.* at 574–82. The Appeals Council declined to review the decision, making the ALJ's decision the final decision of the SSA Commissioner. *Id.* at 6.

Plaintiff filed a lawsuit in this Court, seeking review of the SSA's decision to deny her benefits. *See Kimberly M. v. Berryhill*, Case No. 17 C 2344 (N.D. Ill.). Magistrate Judge Weisman, to whom the case was assigned, determined that the ALJ had improperly evaluated the opinions of two agency medical reviewers; failed to credit the reviewers' opinions that Plaintiff suffered from the severe impairment of "Disorders of Muscle, Ligament, and Fascia"; failed to determine whether Plaintiff's

---

[1] This Court draws all facts from the Certified Administrative Record [5-1], [6-1], and assumes familiarity with the prior decision in Plaintiff's case.

fibromyalgia equaled the severity of a listed impairment as required by step three of the disability analysis; and improperly weighed the opinion of Plaintiff's treating physician, Dr. Bancerek-Stengele. [5-1] at 608–12. Accordingly, Judge Weisman reversed the SSA Commissioner's decision and remanded the case. *Id.* at 612.

On remand, the case was returned to ALJ Ferrer, who held a second hearing on February 27, 2018 and issued a second decision on March 21, 2018, again denying Plaintiff's claim for benefits. *Id.* at 553–64.

At the second hearing, the ALJ again heard from Plaintiff, who was represented by counsel, and also heard from both a Vocational Expert (VE), and a Medical Expert (ME). [6-1] at 3–68. At the outset, counsel agreed that the ALJ needed to address Plaintiff's fibromyalgia under the Social Security Regulations generally, as no listing covered the condition. *Id.* at 11. Plaintiff testified that she last worked in 2013; since then, she testified, her "life is on the couch"; she has trouble walking, experiences pain and numbness in her right leg, cannot really use the stairs, and needs to use the bathroom approximately every 15 minutes. *Id.* at 12. She later testified that she is in the bathroom "maybe every half hour or so." *Id.* at 36. She testified that she babysits her 10-year-old grandson approximately once a month for an hour or two. *Id.* at 23. Specifically with regard to her fibromyalgia, Plaintiff testified that she had not seen a doctor for this condition; her pain doctor diagnosed it and told her the numbness in her fingers may be a symptom of this condition. *Id.* at 32–33. She also testified that, although she never sought work, she applied for

unemployment benefits, knowing she had to represent she was looking for work when she did so. *Id.* at 39.

With regard to Plaintiff's impairments, the ME testified on remand that Plaintiff has "lumbar pain . . . second to laminectomy, degenerative disc disease of the lumbar spine, spinal stenosis, hypertension, and fibromyalgia; she also underwent bariatric surgery for morbid obesity. *Id.* at 47. The ME testified that the record showed Plaintiff was "doing well" after surgery, and nothing in the record suggested she was experiencing colon issues. *Id.* The ME further testified that the only evidence in the record relating to fibromyalgia was a June 28, 2016 note documenting "trigger point tenderness 14 out of 18" on physical examination. *Id.* at 48, 50. But he also testified that this single source constituted a credible diagnosis; he testified that the record need not contain a second source for him to credit the fibromyalgia diagnosis. *Id.* at 62.

With regard to the impact of these conditions on Plaintiff's daily life, the ME testified that Plaintiff had no limitations relating to her hypertension and that the record contained no evidence to suggest that Plaintiff's bariatric surgery or colon issues affected her daily life. *Id.* at 52, 58. He testified that her back pain, well documented in the record, appeared to be managed with medication, including injections; he testified that her medication was "fairly effective." *Id.* at 54. He also testified that her treaters instructed Plaintiff to use anti-inflammatory medication (NSAIDs, ibuprofen, naproxen) for "breakthrough pain"—that is, pain experienced despite the use of opioids. *Id.* at 58. The ME also testified, however, that continued

use of opioids may not provide total relief from pain, *id.* at 61–62. He testified that "there is no perfect solution for pain." *Id.* at 62. The ME noted that Plaintiff's treaters were not employing physical therapy, or any other therapies, to address her pain. *Id.* at 53, 57.

The ME testified that Plaintiff's impairments, combined, did not meet or equal in severity any listed impairment. *Id.* at 59. But her impairments, taken together, do limit her ability to work: the ME testified that Plaintiff is limited to sedentary work, with occasional postural activities; no climbing ladders, ropes, or scaffolds; because of her opioid use, she cannot work at unprotected heights, cannot be around heavy machinery, and cannot drive for commercial purposes; and she must limit her exposure to extreme cold and vibrations. *Id.* at 59. The ME testified that, given Plaintiff's condition, repetitive motion and prolonged standing and walking would cause her pain. *Id.* at 60.

The ALJ then heard from a VE who testified on remand that Plaintiff's past work as a receptionist constituted a sedentary position, both in physical demand and as performed; and the job was classified as SVP 4, semiskilled. *Id.* at 64. The ALJ asked the VE to consider a hypothetical person who: could lift and carry up to ten pounds, stand and/or walk about 2 hours in an 8-hour day, and sit about 6 hours in an 8-hour day; could push and pull to the same extent as they can lift and carry; could occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, occasionally balance, stoop, kneel, crouch, and crawl, and only occasionally be exposed to extreme cold and vibration; could not drive or work with hazardous

machines or in high, exposed places. *Id.* at 64. When asked whether this hypothetical person could perform Plaintiff's past work, the VE said "yes." *Id.*

Plaintiff's counsel then asked the VE to consider a hypothetical person who could lift only 5 pounds, stand and walk less than one hour in an 8-hour workday, and sit less than four hours in an 8-hour workday; the VE testified that such a person could not perform any job in a competitive economy. *Id.* at 65. The VE also testified that the same would be true for a person whose impairments put her off task for 10 minutes every 15 to 30 minutes. *Id.*

Based upon this testimony, as well as the evidence in the record, on March 21, 2018, the ALJ concluded for a second time that Plaintiff was not disabled and not entitled to benefits. [5-1] at 549, 564.

Employing the five-step sequential evaluation process, the ALJ first determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date, September 23, 2013. *Id.* at 555.

At step two, the ALJ determined that Plaintiff has two severe impairments that significantly limit her ability to perform basic work activities: degenerative disc disease and stenosis of lumbar spine, status post laminectomy. *Id.* The ALJ noted that Plaintiff had additional impairments—hypertension, fibromyalgia, obesity, arthritis in the knees, attention deficit hyperactivity disorder, generalized anxiety disorder, and possibly colon issues—but determined that these impairments do not significantly limit Plaintiff's ability to function or work. *Id.* at 555–57.

At step three, the ALJ determined that Plaintiff's impairments (alone or in combination) do not meet or medically equal the severity of any impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. *Id.* at 558. Here, the ALJ specifically addressed the issue flagged for remand and determined that "the medical evidence of record does not indicate that the claimant's fibromyalgia contributes to any other severe impairment that would cause that impairment to meet or equal a listing in 20 CFR Par 404, Subpart P, Appendix 1, nor does the record support a finding that the claimant's minimal limitations due to fibromyalgia equal the severity of any listing." *Id.* at 558. In fact, the ALJ determined, "the record documents no significant limitation due to fibromyalgia, and the claimant's alleged lower back and buttock pain is better attributed to her lumbar spine impairment" and "her alleged numbness in fingers and groin pain are not symptoms of fibromyalgia, per the testimony of the medical expert." *Id.* at 558–59.

Turning to step four, the ALJ determined that Plaintiff had the Residual Function Capacity (RFC) to perform less than the full range of sedentary work. In particular, the ALJ determined that Plaintiff could: lift and carry and push and pull up to 10 lbs.; stand and/or walk for about 2 hours in an 8-hour workday and sit for about 6 hours in an 8-hour workday; occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; occasionally be exposed to extreme cold and vibration; never work with hazardous machines or in high, exposed places; and never drive commercially. *Id.* at 559.

Based upon this RFC, the ALJ determined, at step four, that Plaintiff could perform her past work as a receptionist, as actually and generally performed. *Id.* at 563–64. The ALJ did not reach step five but, in light of her step four determination, found Plaintiff not disabled. *Id.* at 564.

Plaintiff appealed the second unfavorable ALJ decision; the Appeals Council denied review and Plaintiff again sought review in this Court.[2] *See* [1]. Plaintiff asks the Court to reverse the final decision of the ALJ and grant DIB as of the alleged onset date; alternatively, she asks the Court to reverse and remand for a hearing within 120 days. *See* [8]. The Commissioner asks the Court to affirm the ALJ's decision. *See* [20].

## II. <u>Legal Standard</u>

An ALJ's findings of fact are "conclusive" as long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). The "threshold for such evidentiary sufficiency is not high"; it "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Thus, after a "critical review of the evidence," *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993), the Court affirms any adequately supported denial, even if reasonable minds could disagree about disability status, *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008), remanding only if the decision lacks

---

[2] This time, the case was randomly assigned to Magistrate Judge Cole, and the parties did not consent to his jurisdiction. The case thus remained pending before this Court.

evidentiary support or adequate discussion of the issues, *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The regulations prescribe a five-part sequential test for determining disability, *see* 20 C.F.R. §§ 404.1520(a), 416.920, requiring the Commissioner to consider whether: (1) the claimant has performed any substantial gainful activity during the period for which the claimant asserts disability; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any listed impairment; (4) the claimant retains the residual functional capacity to perform ("RFC") claimant's past relevant work; and (5) the claimant is able to perform any other work existing in significant numbers in the national economy. *Id.*; *see Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001).

## III.   **Discussion & Analysis**

Plaintiff claims error in the ALJ's RFC analysis. Specifically, she argues that the ALJ: (1) failed to consider Plaintiff's fibromyalgia; (2) improperly weighed treater Dr. Bancerek-Stengele's opinions; (3) improperly rejected the ME's opinions; and (4) erred in assessing Plaintiff's credibility and subjective symptoms.  The Court considers each argument below.

9

A.    **The ALJ's RFC Findings Relating to Fibromyalgia**

Plaintiff argues that the ALJ failed to accommodate her fibromyalgia in the RFC, despite the ME testifying at the second hearing that Plaintiff's fibromyalgia was properly diagnosed.   [5-1] at 1158; [8] at 3.   She argues that the ALJ mischaracterized the evidence and that such mischaracterization compels reversal. [8] at 5.   The record, however, confirms that the ALJ did not mischaracterize the evidence or fail to accommodate Plaintiff's fibromyalgia in the RFC.

For example, the ALJ properly considered record evidence and SSA regulations (SSR 12-2p: Titles 11 and XVI: Evaluation of Fibromyalgia) in determining that Plaintiff's fibromyalgia was not severe.   As Judge Weisman noted during the last appeal, although fibromyalgia may produce non-exertional physical or mental limitations, Plaintiff identified no record evidence suggesting that she had such limitations.   *See* [5-1] at 611.   That remains true this time around.   Indeed, at the February 2018 hearing, the ALJ asked Plaintiff about her fibromyalgia symptoms and Plaintiff mentioned only numbness in her fingers and pain in her groin, nothing more.   [6-1] at 33.   Plaintiff herself attributed no concentration-related deficits to fibromyalgia;   nor did any medical provider.    And any deficits concerning concentration and thinking related to her ADD, which she admits she addressed with Adderall.   *Id.* at 43.

Plaintiff also argues that the ALJ focused excessively upon the objective medical evidence and misapprehended the nature of her impairments.   [8] at 5–6. Specifically, Plaintiff complains that the ALJ did not consider the waxing and waning

nature of fibromyalgia or Plaintiff's potential for exertional and non-exertional limitations resulting from fibromyalgia. *Id.* at 5. Plaintiff argues that her difficulty concentrating, a non-exertional mental impairment, had more than a minimal effect upon her work-related activities and should have been considered in the RFC and ALJ's hypothetical questions to the VE. [22] at 2. But, again, she never mentioned such limitations in her hearing testimony and the "nature" of her impairment is not documented in the medical records.

Before determining Plaintiff's RFC, the ALJ also considered how Plaintiff's mental impairments (attention deficient hyperactivity and generalized anxiety disorders) impacted her functional ability to understand information, interact with others, concentrate, and adapt. [5-1] at 552. Using record evidence from Plaintiff's treating psychiatrist,[3] the ALJ found that these mental impairments were non-severe and caused no more than a mild limitation. *Id.* at 470, 553. In short, the ALJ did not need to factor Plaintiff's mental limitations into the RFC, because the ALJ reasonably found that the limitations did not have a significant effect upon Plaintiff's ability to work. [5-1] at 556. As discussed, Plaintiff herself indicated that any concentration-related issues were addressed with Adderall.

Relatedly, Plaintiff argues that the ALJ should have included her concentration issues in her hypothetical to the VE during the hearing, [22] at 3, citing

---

[3] Plaintiff's psychiatrist noted that Plaintiff had an "excellent" (unlimited) ability to: remember locations and procedures; understand, remember, and carry out short, simple instructions; understand remember, and carry out detailed instructions; maintain attention and concentration for extended periods; maintain regular attendance and be punctual; sustain an ordinary routine; and make simple work-related decisions, as well as a good (mostly unlimited) ability to work with or near others, complete a normal workday, and perform at a consistent pace, [5-1] at 475.

*Moreno v. Berryhill*, 882 F.3d 722 (7th Cir. 2018). In *Moreno*, a claimant with demonstrated record of becoming distracted, spacing out, and experiencing difficulties concentrating, applied for SSI and DIB; the ALJ held a hearing and questioned a VE, offering a hypothetical that failed to specify information or language about the plaintiff's moderate mental limitations in concentration, persistence, and pace. *Id.* at 730. The Seventh Circuit found that, given the plaintiff's well-documented problems with concentrating, the ALJ's failure to include such limitations in the hypothetical posed to the VE constituted error. *Id.* at 730.

*Moreno* does not help Plaintiff. The Seventh Circuit's holding in *Moreno* confirms that an ALJ's hypothetical "must include all limitations supported by the medical evidence in the record." *Id.* Here, although Plaintiff faults the ALJ for failing to include in the hypothetical limitations in concentration and thinking, such limitations were not documented in the medical evidence. In fact, as the ALJ noted, by the end of 2017, Plaintiff had stopped going to behavioral health treatment and was "asymptomatic." Plaintiff's hearing testimony on remand actually suggests that, before taking Adderall (which Plaintiff takes for ADHD), she could not read or follow a television detective program; and she did not testify that she continues to experience such limitations as a result of her fibromyalgia. In fact, when questioned about the effects of her fibromyalgia, she only told the ALJ that she experiences numbness in her fingertips and groin area pain (neither of which are associated with fibromyalgia according to the ME). And, while Plaintiff faults the ALJ for failing to include concentration-related limitations in her hypothetical to the VE, Plaintiff's

counsel similarly did not include such deficiencies in his hypothetical to the VE (counsel instead questioned about a limitation relating to being off task for frequent bathroom breaks). [6-1] at 65. Indeed, Plaintiff reported that her concentration issues were resolved with Adderall and neither she nor her medical records suggest ongoing or persistent limitations in this regard.

The ALJ also determined that Plaintiff's fibromyalgia, though diagnosed, was not severe within the meaning of the Social Security Act. And she explained in detail her reasons for doing so. Her findings on this issue, and her decision not to include unsupported non-exertional limitations in her RFC, stand upon substantial evidence, and the Court finds no basis to disturb them.

## B.   <u>The ALJ's Consideration of Dr. Bancerek-Stengele's Opinion</u>

Plaintiff next argues that the ALJ did not provide good reasons for giving only some weight to Dr. Bancerek-Stengele's opinion that Plaintiff could lift no more than five pounds, stand and walk less than one hour of eight, sit less than four hours of eight, and not work a full day. [8] at 6–7.

The ALJ affords a treating physician's opinion controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." 20 C.F.R. §§ 404.1527(c)(2); *see Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010).[4] If a treating physician's opinion is being discounted, the ALJ "must give good reasons" for doing so. 20 C.F.R. §§ 404.1527(c)(2). If a treating physician's opinion "is inconsistent with the opinion of a

---

[4] The regulations prescribe a different standard for claims filed after March 27, 2017, *see* 20 C.F.R. § 404.1520c.

consulting physician or when the treating physician's opinion is internally inconsistent," an ALJ may properly discount it, as long as the ALJ "minimally articulates" the "reasons for crediting or rejecting evidence of disability." *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir. 2007). When determining the weight to give a physician's opinion, an ALJ must consider: the length, nature, and extent of the treatment relationship; frequency of examination; physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion. *Larson,* 615 F.3d at 755. The ALJ must "minimally articulate" the reasons for assigning little weight to the opinion. *Henke v. Astrue,* 498 F. App'x 636, 639 (7th Cir. 2012).

Here, the ALJ gave Dr. Bancerek-Stengele's statement "little weight" because it "greatly exaggerates" Plaintiff's physical limitations "when contrasted with findings in the record," and because Dr. Bancerek-Stengele was Plaintiff's obstetrician/gynecologist, who saw Plaintiff generally just for pap smears and mammograms. [5-1] at 563. Although Plaintiff challenges this latter finding, she herself characterized Dr. Bancerek-Stengele as her OB/GYN and testified that she was "the doctor who does my Pap smears, my mammogram." [6-1] at 30. Dr. Bancerek-Stengele's records similarly indicate that Plaintiff came to her for "routine gynecological examination." [5-1] at 873, 970. Accordingly, the Court finds that the ALJ reasonably characterized her as such.

So too, the ALJ reasonably determined that the record, generally (and Dr. Bancerek-Stengele's own treatment notes, specifically) contradicted her "extreme limitations" finding in her medical source statement. *Id.* Dr. Bancerek-Stengele's

own examination notes generally indicate that Plaintiff was doing okay and did not have any major deficits. Indeed, at each appointment, Dr. Bancerek-Stengele noted that Plaintiff was able to walk and that they discussed regular exercise. *See* [5-1] at 446 (Dr. Bancerek-Stengele's medical notes from March 6, 2013 indicating that Plaintiff was "able to walk"; "over all doing fine"; "use [*sic*] to go to pain clinic for pain management, stable for last couple years"); 462 (notes from October 9, 2013 indicating that Plaintiff was "able to walk"); and 459 (notes from May 5, 2014 indicating that Plaintiff was "able to walk"; over all doing OK. Back pain about the same, medications helping."). In explaining the basis for discounting Dr. Bancerek-Stengele's opinion, the ALJ also cured the prior deficiency noted by Judge Weisman, because the ALJ considered the length, nature, and extent of Plaintiff's relationship with Dr. Bancerek-Stengele, her specialty, the types of tests performed, and the consistency and supportability of her opinion. And the ALJ's explanation finds substantial support in the record.

### C. The ALJ's Consideration of the ME's Opinion

Plaintiff next argues that the ALJ assumed the role of a doctor when she improperly weighed the ME's physical medical opinions. Plaintiff also argues that the ALJ acted inconsistently and did not provide good reasons when she chose to give little weight to the ME's opinion regarding Plaintiff's fibromyalgia and great weight to the ME's opinion regarding Plaintiff's functional capacity.

It is true that the ME opined that, on one occasion, Plaintiff's fibromyalgia was "properly diagnosed" in the sense that, at one point, 14 of 18 tender points were

clinically documented. [6-1] at 48. But the ME also noted that Plaintiff's record showed no evidence of "widespread pain," and included nothing else in terms of physical exams that would lead to a diagnosis of fibromyalgia. *Id.* at 48–50. He also testified that the symptoms Plaintiff associated with her fibromyalgia (numbness in her fingers and groin pain) are not indicative of the condition. *Id.* at 51. In short, the ME's testimony is consistent with the ALJ's findings concerning fibromyalgia, and the ALJ's findings are well-supported.

### D. The ALJ's Credibility Assessment

Finally, Plaintiff argues that the ALJ erred in assessing her credibility and discounting her subjective symptoms. This Court gives special deference to an ALJ's credibility findings, and such findings are overturned only if "patently wrong." *Summers v. Berryhill,* 864 F.3d 523, 528 (7th Cir. 2017) (quoting *Eichstadt v. Astrue,* 534 F.3d 663, 667–68 (7th Cir. 2008)); *see also Matthews v. Saul,* 833 Fed. App'x 432, 437 (7th Cir. 2020) (finding even where the Commissioner conceded the record could be read differently, the ALJ's partially adverse credibility finding was not "patently wrong" and "substantial evidence" supported his conclusion that the plaintiff's complaints "were not entirely consistent with the record."). A decision is "patently wrong" when it lacks any explanation or support. *Elder,* 529 F.3d at 413–14. Here, the ALJ explained in detail why she found Plaintiff incredible and her decision can in no way be described as patently wrong.

Initially, Plaintiff suggests in her motion that the ALJ had the burden of production to discredit or disregard Plaintiff and her subjective symptoms. Not so.

The SSA's five-step sequential evaluation process imposes upon Plaintiff the burden of production throughout the first four steps; only at step five does the burden shift to the ALJ to produce evidence demonstrating that other work exists in significant numbers in the national economy that Plaintiff can do. 20 CFR § 404.1560(C)(2). Here, the ALJ did not need to reach step five.

In determining Plaintiff's RFC, the ALJ complied with the SSA's two-step process, including considering Plaintiff's statements about the intensity and limiting effects of her symptoms. 20 CFR § 404.1529. When the Plaintiff's statements are not supported by the objective medical evidence, the ALJ must consider other evidence in the record to determine if Plaintiff's symptoms limit the ability of Plaintiff to do work-related activities. *Id.*, § 404.1529(a). Here, there was no other evidence. The ALJ compared Plaintiff's testimony that her impairments compelled her to lay on the couch all day (suggesting limitations even more exaggerated than those prescribed by Dr. Bancerek-Stengele) to all of the medical evidence and Plaintiff's other statements (some made to the ALJ, some made to Plaintiff's doctors) and found the former to be incredible.

In this regard, Plaintiff argues that the ALJ did not properly analyze Plaintiff's activities of daily living and should have inquired further about certain implications made in the record. For example, the ALJ relied upon a note in which Plaintiff reported to her doctor that she was "performing normal activities of daily living and getting regular exercise." [8] at 12. Plaintiff argues that this statement is ambiguous and that the ALJ should have inquired further about the details before drawing an

adverse inference against Plaintiff. *Id.* at 13. Furthermore, Plaintiff argues that the ALJ also should have inquired more about Plaintiff's fall at a grocery store. *Id.* at 13–14. Finally, Plaintiff also argues that the ALJ should have relied upon a medical opinion to support her finding that Plaintiff would have had atrophy if she were truly lying down most of the day. *Id.* at 13.

The Court disagrees and finds that substantial evidence supports the ALJ's findings. In March 2013, Plaintiff's doctor indicated that she reported "functional status normal activities of daily living improving; gets regular exercise" [5-1] at 403. The notes reflect the same report on May 29, 2013, and on November 15, 2013. *Id.* at 398, 395. During the same time period, Plaintiff offered similar reports to her behavioral health professionals. At a behavioral health appointment on August 20, 2013, Plaintiff reported that her medication was working well, with no side effects, that she was employed and things were going well; *id.* at 474; on February 25, 2014, she reported riding her bike three times a week and that she had just returned from Arizona for vacation, *id.* at 472; on May 20, 2014, she reported that she was riding her bike three times a week and starting to walk on some days, *id.* at 471; on August 12, 2014, she reported that her mood was good and that she had been exercising regularly, *id.* at 481; on October 21, 2014, she reported having anxiety but her mood was good, and she reported exercising regularly, *id.* at 480; on November 11, 2014, she reported exercising regularly, *id.* at 479; and in February and May 2015, she reported that she was doing well in her own townhouse and exercising regularly, *id.* at 478–79. An October 14, 2013 medical source statement rated her at "good" or

"excellent" across all parameters, but noted that, without her medication, she is easily distracted and has difficulty staying on task. *Id.* at 470. Primary care notes from June, July, and August of 2015 indicate that Plaintiff reported "doing well." *Id.* at 484–501. All this evidence (much of it self-reported by Plaintiff) undermines Plaintiff's testimony at the hearing that her impairments compelled her to spend her days on the couch.

Even the most recent medical records confirm that Plaintiff, although continuing to experience significant pain in her back and buttocks, had no other complaints or side effects. Records throughout 2015 and 2016 note that she arrived for her regular appointments unaccompanied and reported "no acute distress" and only mild tenderness to palpation; she self-reported that "prolonged standing and walking" made her pain worse and "lying down and taking medication" helped; Plaintiff reported doing physical therapy home exercises. *See* [5-1] at 839–870. On May 18, 2016, her Hinsdale Orthopaedics treater advised her to return on an as-needed basis, *id.* at 870, and there is nothing in the record to suggest that she returned. Similarly, following a routine visit in December 2016, her general practitioner, Dr. Dalius Kedainis, advised her to return promptly if her symptoms remained uncontrolled or worsened or "as clinically indicated." *Id.* at 885–87. Yet the record shows that she continued to receive treatment at regularly-scheduled appointments only. Thus, in contrast to *Moreno*, where post-assessment treatment notes demonstrated a worsening of the claimant's condition, 882 F.3d at 728–29,

Plaintiff's medical records paint a consistent picture of someone who, despite impairments and pain, is not as limited as she claimed at her hearing to be.

In addition to the inconsistencies between Plaintiff's testimony and the medical records, the ALJ also noted numerous inconsistencies within Plaintiff's own testimony. For example, Plaintiff testified that she could not drive, then admitted that she drove herself to the hearing and admitted that she had a renewed driver's license; Plaintiff testified that she obtained minimal relief from steroid injections, yet she admitted that she continued to get them for years; Plaintiff testified that she could only walk for 15 minutes, then said she could only walk for 10 minutes; Plaintiff testified that she mostly does not go out alone, yet she routinely attended medical appointments by herself; and Plaintiff told the ALJ that she can sit for an hour or two, but then testified in response to questions from her attorney that she could only sit for 10 minutes. Such inconsistencies amply explain the decision to discount Plaintiff's subjective complaints and self-assessment of her limitations. *See, e.g., Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006) ("Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case."). Plaintiff also admitted that she lied on her unemployment benefits application when she certified that she was actively looking for work; in fact, she testified, she had not sought employment since leaving her receptionist job.

20

In short, the ALJ adequately explained her reasons for discounting Plaintiff's testimony about her symptoms and limitations, and this Court cannot second guess those findings on this record.[5]

## IV.    Conclusion

For the reasons explained above, this Court finds that the ALJ's decision rests upon substantial evidence in the record.  Accordingly, the Court denies Plaintiff's motion for summary judgment [7], grants the Commissioner's motion for summary judgment [20], and affirms the Commissioner's decision to deny benefits.

Dated:  June 7, 2022

Entered:

John Robert Blakey
United States District Judge

---

[5] Contrary to Plaintiff's contention, the fact that she may have experienced drowsiness and nausea does not *per se* preclude work or otherwise undermine the ALJ's RFC findings.  Especially in light of the mental medical source statement noting excellent/unlimited cognitive abilities and the fact that Plaintiff consistently denied medication side effects to her treaters, this Court finds that the ALJ appropriately accommodated any drowsiness or nausea in her RFC when she found that Plaintiff "should not work with hazardous machines with moving mechanical parts, work in high, exposed places, or drive motor vehicles in the performance of job duties."  [5-1] at 559.